IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 26, 2005

## DANNY JAMES MCALPIN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Robertson County**
**No. 8086     Jane Wheatcraft, Judge**

---

**No. M2004-03043-CCA-R3-PC - Filed October 5, 2005**

---

The petitioner, Danny James McAlpin, appeals the denial of post-conviction relief. The single issue presented for review is whether he was denied the effective assistance of counsel. The judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court is Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Danny James McAlpin.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On June 23, 1991, the petitioner was charged with the first degree murder of the victim, Sandie Horton. He was tried, convicted, and sentenced to a term of life in prison. This court affirmed the conviction and sentence on direct appeal. State v. Danny James McAlpin, No. 01C01-9310-CC-00344 (Tenn. Crim. App., at Nashville, Jan. 26, 1996). There was no application for permission to appeal to the supreme court.

In the opinion of this court on direct appeal, the facts are set out in detail. In summary, it appears the petitioner and his son, Scott McAlpin, met the victim and two other women, Rita Scott and Teresa Danielle Parrish, at a bar in Nashville and later arranged to meet at the residence of the petitioner. When the victim and Ms. Parrish arrived, Ms. Scott and her two minor daughters were already present. A day or two later, the victim, who lived with Ms. Scott's mother, informed Ms. Scott that she had seen the petitioner's son, Scott McAlpin, looking at Ms. Scott's two daughters "in a suggestive manner, licking his lips" as the children were getting out of a shower. When Ms. Scott confronted him with the accusation, Scott McAlpin denied having done so and on the following day

refused to allow the victim inside his apartment. Ms. Scott and her two daughters, who were at the apartment to have dinner with the petitioner and his son, were inside the apartment while the victim chose to remain in Ms. Scott's car parked outside. At one point, Ms. Scott overheard Scott McAlpin strike the wall of the apartment and remark that he would "like to kill" the victim.

Afterward, the petitioner and his son discussed the accusation the victim had made and then took turns walking to the car to confront her. When Ms. Scott decided to go to the car and warn the victim about the possibility of danger, the petitioner stopped her, explaining that everything was "under control." At that point, Scott McAlpin offered to drive the victim to the home of one of her friends and the petitioner interrupted saying, "No, I'll take her out." The petitioner left with the victim for approximately forty-five minutes and upon his return was met outside by his son. Scott McAlpin then drove the petitioner to a creek where the petitioner washed himself and disposed of a knife. Twenty or thirty minutes later, the two men returned to the petitioner's apartment carrying two paper bags that contained the victim's clothing and her purse. A short while later, the petitioner directed his son to get rid of the bags. After his return, the petitioner took a shower with his clothes on. Later, he admitted to Ms. Scott that he had killed the victim, slitting her throat and cutting her stomach out. According to Ms. Scott, he also told her that he had stabbed the victim's legs and arms. He then warned Ms. Scott that he would come after her and her children if she told anyone about the incident.

Ms. Scott reported the incident to the Robertson County Sheriff's Department. Scott McAlpin also made a statement implicating the petitioner. The murder weapon was recovered from the creek. The petitioner admitted to police that he was angered by the victim's derogatory remarks about his son and that he took her to a roadside and stabbed her to death. While in jail, the petitioner, who was a musician, wrote a song admitting to the killing and expressing his remorse. Officers found the text of the song in the petitioner's cell.

At trial, Scott McAlpin, who had been convicted of voluntary manslaughter for his role in the death of the victim, testified that he had lied to the police in his earlier statements implicating the petitioner. He testified that he had stabbed the victim to death and that the petitioner was blameless. A neurologist also testified for the defense, saying that the petitioner was weaker than normal in his right arm. On cross-examination, however, he acknowledged that it was possible for the petitioner to have used the arm to stab the victim.

Dr. Charles Harlan, who testified for the state, also concluded that the petitioner had sufficient strength in his right arm to have inflicted the fatal wounds. It was his opinion that it could not be determined whether the wounds were caused by the right or the left hand. Dr. Harlan, who performed the autopsy, determined that there were thirty-eight separate stab wounds, a number of which were defensive wounds. He stated that a wound to the victim's throat had caused her death. It was his opinion that she had remained conscious for as long as twenty minutes after the wounds were inflicted.

On December 2, 1996, the petitioner filed this petition for post-conviction relief alleging, among other things, that he was denied the effective assistance of counsel at trial. The petitioner contended that his trial counsel was ineffective in a number of ways, including his failure to adequately confer with the petitioner in advance of the trial, his failure to secure witnesses vital to the defense, his failure to arrange medical and other expert testing in preparation for trial, his failure to allow the petitioner to testify on his own behalf, and his failure to adequately prepare for trial.

The trial court appointed counsel who then withdrew after accepting employment with the district attorney general's office. A second attorney had to withdraw after discovering a conflict of interest. A third attorney was appointed in 1999 but another conflict developed which required withdrawal. Later, the petitioner filed a lengthy motion in which he complained about lack of communication after the appointment of a fourth attorney, seeking the appointment of new counsel. Through the fifth counsel appointed for the petitioner, the petition was amended to include allegations that trial counsel was ineffective for not attempting to suppress the confession that the petitioner contended was the result of coercion by officers at the Robertson County Jail.

At the evidentiary hearing, the petitioner, who asserted that his trial counsel was ineffective for having failed to interview and present as witnesses Frances Vallee, his ex-wife, and Kimberly Franz, his daughter, offered their depositions in lieu of live testimony. Ms Vallee, who lived in Oregon at the time of the victim's death, recalled that Scott McAlpin had telephoned her on the night of the stabbing saying that his father had just done "something bad." She stated that she could hear who she believed to be Rita Scott in the background laughing. She recalled that Scott McAlpin was laughing as well and she speculated that it was because the petitioner "got coming what he deserved a long time ago." Ms. Vallee testified that she talked with Scott McAlpin again in 2003, well after the filing of this petition, and that he denied having anything to do with the murder. She also remembered that a detective had interviewed her shortly after the victim's murder. She stated that the petitioner's trial counsel did not contact her.

Kimberly Franz also lived in Oregon at the time she gave her deposition. She stated that Scott McAlpin telephoned her on the morning after the stabbing to inform her that the petitioner had killed someone. She also testified that McAlpin and a female that she overheard in the background were laughing, chuckling, and talking during the telephone conversation. Ms. Franz speculated that her brother had been drinking and was not completely stable. She stated that she did not believe that the petitioner was guilty of the murder and was aware that her step-brother had entered a plea of guilty to voluntary manslaughter. She understood that Scott McAlpin, who was somehow protected by double jeopardy, had claimed responsibility for the murder at her father's trial. Ms. Franz confirmed that while she had talked with a detective at Robertson County Sheriff's Department, she had not talked with anyone representing the petitioner in advance of the trial. She recalled that in a later conversation, Scott McAlpin stated that the petitioner got what he deserved "for everything that he had done [in the past]," apparently referring to his shortcomings as a father.

The petitioner complained that his trial counsel did not meet with him prior to the preliminary hearing and that he had no recollection of having such a hearing. He stated that he met

with his counsel only three times for no more than five to ten minutes prior to trial. It was his contention that an investigator met with him only once for ten minutes and that despite the fact that he had written his trial counsel twenty times, he only received three responses. The petitioner claimed that his trial counsel did not supply him with copies of the pleadings, failed to file a motion to suppress his confession, and neglected to contact any of his out-of-state family or friends, or Scott McAlpin, who had separate counsel, as potential witnesses. The petitioner contended that trial counsel failed to object to false testimony offered by a police officer, was inattentive during the course of the trial, and at one point called the wrong juror as a witness after the juror had possible improper communication with a prison guard during the course of the trial. The petitioner stated that he did not sign a waiver of his right to testify but acknowledged that, based upon advice of the officers who had been assigned as his guards, he chose not to testify. He complained that his confession was coerced and that his trial counsel had a conflict of interest because he refused to take action against the jailers that had beaten him during his pretrial incarceration. The petitioner contended that his trial counsel should have asked for a myelogram to support his claim that he was physically incapable of committing the multiple stabbings. He expressed concern that his trial counsel failed to utilize either Ms. Vallee or Ms. Franz as witnesses and complained that his landlord and neighbors should have been called as witnesses to testify that Scott McAlpin had destroyed much of the evidence.

Detective Ronnie Perry of the Robertson County Sheriff's Department denied that the petitioner had been mistreated at the jail and contended that the petitioner had injured several of the employees there. He recalled that he had received a note from the petitioner just before the trial asking to make a statement. Detective Perry testified that the petitioner signed a waiver, was advised of his rights, and was informed that he needed to talk with his attorney before making the statement. According to the detective, the petitioner made a taped statement, against the advice of his trial counsel, during which he admitted stabbing the victim, saying, "[W]hen she started mentioning that . . . Scott was looking at this lady's kids with derogatory things, it topped me off, man, and I said "screw it." And I took her along side the road and stabbed the s[***] out of her." The petitioner described the event as follows:

> I says, "come on out of the car." She stepped out of the car and I didn't even stop til[l] she was gone. I didn't talk to her about it or nothing[,] I just did it. That fast. . . . I grabbed her by the head of the hair. I go like that. . . . She put her leg one time like that and that was all she wrote. But that was like about the forth or fifth pass. And last effort, but no she didn't fight. . . . She wasn't close to me enough to where I was getting blood on me. I don't think I got any blood on me at all. . . . I drove straight to the house. . . . And Scott and Rita were both for this thing. Scott put the scabbard on the belt and I put the belt on. . . . the only thing Scott didn't do, ha, ha, is do the job. But he wanted her dead and so did Rita. And I mean, if I didn't have that support behind me[,] I wouldn't have even thought about it. I mean I thought they, alright, they're not going to be talking, I can get this silly bitch out of our life. I mean she was a leach on everybody, she was a druggie. She had people after her wanting to kill her. . . . and I come home, I honked the horn and [Scott] came up and drove me [to] another area to where I could wash the blood off my arm. . . . I figured

if I was going to get caught, I'll get caught. . . . I'm not the kind of person that can handle it anyway. I'd of probably ended up coming to you guys after a little bit. But uh, I was just . . . enraged and as far as I was concerned I was supported one hundred percent by Scott and Rita. . . . [Scott] took me to a place where a creek[']s at. I . . . washed it off, sand and all that stuff, and I stepped on it. . . . Then go back to the house and I'm just scared to death so I just take my clothes just like they are and just jumped in the shower just in case I had blood on me or something. And I just stood there with a bar of soap . . . . and Scott said I'm going to check her stuff out. He thought she had some money. He went through and checked for money. And he said, "Well she had some money, she must have had it on her."

Trial counsel, who was a former public defender, testified that he represented the petitioner at trial and on appeal. He confirmed that he had filed several motions on behalf of the petitioner prior to the trial, including a motion to suppress the evidence. According to trial counsel, he also filed motions for a mental evaluation of the petitioner and a motion for an evaluation by a neurosurgeon, whose testimony was later presented at trial. Trial counsel contended that neither Ms. Franz nor Ms. Vallee had information helpful to the defense, that he had conferred with the petitioner in advance of the trial, and that he was fully prepared. He acknowledged that the petitioner had continuously alleged that he had been beaten at the jail in Robertson County but denied that he had any conflict of interest as to that issue. Trial counsel explained that he found no reason to call neighbors of the petitioner because no evidence had been destroyed at his residence. Trial counsel testified that Dr. Kershner evaluated the petitioner and then chose not to conduct a myelogram. It was trial counsel's strategy to challenge the evidence presented by the state, rely upon the confession offered by Scott McAlpin at the trial, and, in the alternative, try to persuade the jury that because of the petitioner's diminished capacity, he was unable to form the requisite intent to commit first degree murder. Trial counsel expressed concern, however, about the strength of the state's case, especially with the petitioner's confession to the police and the incriminating song that he had written and left in his jail cell. It was his testimony that he and the petitioner, after a discussion, mutually agreed that it was in the best interest of the petitioner not to testify.

At the conclusion of the evidentiary hearing, the trial court entered a memorandum opinion and order holding that trial counsel was prepared, had filed all the appropriate motions, had adequately communicated with the petitioner, had properly moved to suppress the confession, and had then presented the suppression issue on direct appeal. The post-conviction court further ruled that the evidence was so overwhelming, particularly given the admissibility of the confession and the incriminating song left by the petitioner in his jail cell, any deficiencies in performance would not have been prejudicial.

In this appeal as of right, the petitioner argues only that trial counsel's failure to interview and present as witnesses Frances Vallee and Kimberly Franz, who spoke by telephone with Scott McAlpin shortly after the stabbing and recalled that he and Rita Scott had laughed at inappropriate times during their conversation, should have been called as defense witnesses at trial. The petitioner submits that Ms. Vallee could have testified that Scott McAlpin made the comment that the

petitioner was "getting what he deserved" for having been a bad father. He maintains that the result of the trial would have been different if this evidence had been introduced.

Under our statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. Id. at 687. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. Id. at 695. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of

correctness.  Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

In Black v. State, 794 S.W.2d 752 (Tenn. Crim. App. 1990), this court enumerated the standard for establishing prejudice by counsel's failure to subpoena witnesses.  To establish prejudice, the petitioner must: "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness."  Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black, 794 S.W.2d at 757).  This standard requires a petitioner to produce the uncalled witness at the post-conviction proceeding so that the court need not speculate as to the materiality of the testimony or credibility of the missing witness. Black, 794 S.W.2d at 758.

With regard to the duties of defense counsel, our supreme court held in State v. White, 114 S.W.3d 469 (Tenn. 2003), as follows:

> "[T]he basic duty defense counsel owes to the administration of justice and as an officer of the court is to serve as the accused's counselor and advocate with courage and devotion and to render effective, quality representation." See ABA Standards for Criminal Justice 4-1.2(b) (3d ed.1993).  This duty requires defense counsel to exert every reasonable effort to protect the client's interests, both in the investigation and the trial of a case, by interviewing the client; apprising the client of his or her rights; conducting a thorough legal and factual investigation of the case; attempting to obtain information in the possession of the prosecution and law enforcement authorities; filing appropriate motions for the suppression of the evidence; raising all available claims, issues and defenses; conducting effective cross-examination of the State's witnesses; and attempting to mitigate punishment if the client is convicted.

Id. at 478.

The petitioner argues that the witnesses were material, at least in part, because Detective Perry chose to interview them.  Trial counsel, who testified that he was aware of the witnesses and what they knew, apparently chose not to interview either of the women after concluding that their testimony would not be helpful.  The deposition of Ms. Vallee establishes that in the initial telephone conversation, Scott McAlpin informed her that the petitioner "had done something bad."  Several years later, when he visited her in Oregon, Scott McAlpin confirmed that despite his trial testimony to the contrary, he had nothing to do with the murder of the victim

.

Those statements were consistent with what Scott McAlpin had told the police prior to the trial.  According to Detective Perry, they were also consistent with the results of his investigation. Detective Perry could find no evidence that Scott McAlpin was at the crime scene at the time of the murder.  Moreover, it was only after McAlpin had entered a plea of guilt to voluntary manslaughter that he recanted his statement to the police and testified on behalf of the petitioner at his trial, claiming that he, not the petitioner, had killed the victim.  Although the jury rejected the testimony, it would have hardly been helpful for trial counsel to have called Ms. Vallee as a defense witness to

further implicate the petitioner and contradict Scott McAlpin's "confession" at the petitioner's trial.

Similarly, Scott McAlpin telephoned Kimberly Franz shortly after the murder and informed her that the petitioner had killed the victim. That would not have been helpful to the petitioner. Further, it is our view that even if Scott McAlpin and Rita Scott had laughed inappropriately during telephone conversations with both Ms. Vallee and Ms. Franz, it would not have made a difference in the results of the trial in the context of the entire testimony. Nor would any implication that the petitioner was "getting what he deserved" for having been an inadequate father. Finally, Ms. Franz testified that she had a conversation with Scott McAlpin in 2003 regarding the existence of the tape recording wherein he admitted that he was responsible for killing the victim, not his father, and, "that tape is destroyed, . . . they can't do anything about the situation because . . . it would be double jeopardy." This appears to be a reference to Scott McAlpin's testimony at trial. He did, of course, admit at the petitioner's trial that he had killed the victim, a statement that conflicted with the confession of the petitioner, the investigation made by the Robertson County Sheriff's Department, and everything Scott McAlpin had said prior to the trial. Scott McAlpin, of course, having already been convicted of voluntary manslaughter for his involvement in the death of the victim by the time of the petitioner's trial, was protected by double jeopardy principles from being re-indicted for any greater offense regardless of the content of his testimony. That the petitioner made a taped confession of the crime to officers and then wrote a song about the extent of his remorse qualified as the most compelling evidence of his guilt. When measured with that and the other evidence at trial, the depositions of Ms. Vallee and Ms. Franz, if admissible under any exception to the rule against hearsay, were neither so favorable nor so material as to warrant post-conviction relief. The evidence does not preponderate against the judgment of the post-conviction court that the petitioner failed to establish that he was denied the effective assistance of counsel.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-8-